AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

*FILED*
*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW MEXICO*

2023 MAR 31  PM 4: 49

*CLERK-LAS CRUCES*

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 23MR688 |
| 1050 S Triviz Drive, Las Cruces NM 88001 (the Subject Premises) | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and fully incorporated herein.

located in the                       District of        New Mexico              , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 25 U.S.C. § 3001 | Native American Graves Protection and Repatriation Act |
| 16 U.S.C. § 470aa | Archaeological Resource Protection Act |

The application is based on these facts:

See Attachment C, which is attached and fully incorporated herein.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Nicolas Wilson, USDOI - BLM

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
electronic submission and telephonic swearing   *(specify reliable electronic means)*.

Date:  3/31/2023

*Judge's signature*

City and state:  Las Cruces, New Mexico          Kevin R. Sweazea, United States Magistrate Judge

*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is that of Christopher WOOD, at 1050 South Triviz Drive, Las Cruces, New Mexico 88001 Apartment 40, further described as a brick two story apartment complex with white trim.  Apartment 40 is on the second floor with the front door being described as a white in color facing east. The door to apartment 40 has exterior windows on both sides and no number on the door. The apartment doors on each side are labeled with 39 and 41.



The search of the above Subject Premises shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the Subject Premises, and all persons located in the Subject Premises in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the Subject Premises that have an apparent connection to the Subject Premises and/or the Christopher WOOD. Connection to the vehicle may be established by evidence that anyone residing at the Subject Premises and/or the Christopher WOOD own, operate, and/or have access to any vehicle parked at or in front of the Subject Premises. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

**ATTACHMENT B**

*Property to be seized*

1.       All records, information, and evidence relating to violations of 25 U.S.C. § 3001 –
Native American Graves Protection and Repatriation Act, and 16 U.S.C. § 470aa – Archaeological
Resource Protection Act involving Christopher WOOD and occurring after February 5, 2023,
including:

1. Illegally obtained artifact, including, but not limited to, lithics, points, stone drills, mano, metates, items of historic or cultural significance greater than 100 years of age, military memorabilia.

2. Digging utensils, and other items used in the illegal excavation of artifacts.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of artifact transactions.

4. Any and all customer lists, artifact sale records, dealers list, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, artifacts supplied or received, or cash received to pay for illegal artifact collection or intended to pay for illegal artifacts.

5. Proceeds from illegal artifact sales, and valuables obtained from proceeds.

6. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

7.  Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their illegal artifact trafficking associates.

8.  Messages, notes, correspondence, and/or communications between illegal artifact trafficking associates.

9.  Indications of ownership or control of the Subject Premises and/or other premises used in unlawful artifact trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

10. Indications of ownership or control over any vehicles located at the Subject Premises, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

11. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

12. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

13. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of illegal artifacts.

14. Photographs or videos of the illegal collection and dealing of artifacts, their co-conspirators, and the property and assets purchased with illegal artifact sale proceeds.

15. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear that may contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law

3

enforcement officers and agents, attorneys for the government, attorney support staff,

and  technical experts. Pursuant to this warrant, the Bureau of Land Management shall deliver a

complete copy of the seized or copied electronic data to the custody and control of attorneys for

the government and their support staff for their independent review.

### ATTACHMENT C - AFFIDAVIT IN SUPPORT
### OF AN APPLICATION UNDER RULE 41 FOR
### A WARRANT TO SEARCH AND SEIZE

I, Nicholas Wilson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.        I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 1050 S Triviz Drive,

Las Cruces, New Mexico 88001 Apartment 40, hereinafter "the Subject Premises," further

described in Attachment A, for the things described in Attachment B.

1.        I am a Federal Criminal Investigator with the Department of Interior, Bureau of

Land Management and have been so since October of 2022.  As such, I am a "federal law

enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that

is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney

General to request a search warrant.  During my career as a Federal Law Enforcement Officer, I

have conducted numerous criminal investigations concerning the violation of multiple federal laws

and regulations and have received ongoing training in conducting such investigations.  My

experience as a Criminal Investigator includes, but is not limited to: conducting physical

surveillance, interviewing witnesses, writing affidavits for and executing search warrants, working

with undercover agents and informants, issuance of administrative and federal grand jury

subpoenas, analysis of phone toll and financial records, and analysis of data derived from the use

of pen registers, and trap and traces, and wiretaps.  Based on my experience as a Criminal

Investigator, I am familiar with matters including, but not limited to, the means and methods used

by persons and in the violation of the recourse-based crime to include the Native American Graves Protection and Repatriation Act, and Archaeological Resource Protection Act ("ARPA").

2.     I have been involved in an ongoing investigation regarding the illegal removal of artifacts from federal land by Christopher WOOD. Since the investigation's inception, I, as well as other Federal law enforcement officials from the Bureau of Land Management have obtained information regarding the illegal removal of artifacts from federal land by Christopher WOOD.

3.     I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including

     a.     Information provided by Bureau of Land Management Archeologists.

     b.     Results of and Interview with Christopher WOOD.

     c.     Information derived from open-source social media.

     d.     A review of driver's license and automobile registration records.

     e.     Records from commercial databases; and

     f.     Records from the National Crime Information Center ("NCIC").

4.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION

5.     I believe there is probable cause that the Christopher WOOD has committed, are

2

committing, and will continue to commit offenses involving violations of, *inter alia*

      6.      25 U.S.C. § 3001 – Native American Graves Protection and Repatriation Act

      7.      16 U.S.C. § 470aa – Archaeological Resource Protection Act

## EVIDENCE SOUGHT DURING SEARCH

      8.      Based on my training, experience, and participation in this and in similar investigations, I know the information listed below. I further know that illegal artifact collectors often conceal the below described evidence of their illegal collecting in their residences and businesses, or in the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal such evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses. Evidence of the types described below is also frequently found in other areas to which an illegal artifact collector has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property. This evidence, which is discussed in detail in the following paragraphs, includes lithics, points, stone drills, mano, metates, digging utensils, items of historic or cultural significance greater than 100 years of age, military memorabilia, other contraband, records, documents, as well as evidence of illegal artifact transactions, proceeds from illegal artifact sales, and valuables obtained from proceeds.

      a.  Illegal artifact collectors often maintain collections on display.

3

b.  Illegal artifact traffickers often maintain records of their transactions in a manner similar to the record-keeping procedures of legitimate businesses.  Even after the artifacts are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

c.  Illegal artifact collectors often travel domestically and internationally to facilitate their collecting. Evidence of foreign and domestic travel by persons engaged in illegal artifact collecting includes travel itineraries, airline tickets, receipts, passports, and visas.  Many of these items are accessible via the internet and can be downloaded and saved on a computer or other digital media and on storage media.

d.  Illegal artifact collectors often use storage facilities for their collections and other

4

items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms. These locations are often used to store or hide artifacts, contraband, money and other valuables. Illegal artifact collectors often keep documents and other items tending to show the existence of other stored items, contraband, money and other valuables in areas such as storage facilities. Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes. This type of documentation can be stored on digital media and concealed virtually anywhere.

e.   Other evidence of transportation, ordering, possession and sale of Illegal possessed artifacts can include the following: telephone bills to show numbers called by the collector (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns. The above items are stored by illegal artifact collectors on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars. This type of documentation can be stored on digital media and concealed virtually anywhere.

f.   Illegal artifact collectors usually sell their products for cash. In addition, illegal

5

artifact collectors often have other assets generated by their illegal business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

g.  Illegal artifact collectors often try to legitimize these profits from the sale of artifacts.  To accomplish this goal, illegal artifact traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

h.  Evidence of significant, unexplained income of illegal artifacts or for the acquisition and concealment of money and assets of illegal artifact sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box

6

records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on computers and other digital media.  The above items are typically kept by illegal artifact collectors and dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

i.   The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for illegal artifact collectors and dealers/traffickers. Information stored in electronic form on all of the above devices can provide evidence of illegal collecting and trafficking. Illegal collectors and traffickers frequently use some or all these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the illegal artifact trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets,

cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the illegal artifact collector is calling, and thus the identity of potential associates.

j.  Illegal artifact collectors often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their artifact.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Illegal artifact collectors frequently use these devices to take their photographs and videos.

k.  I know that tools (shovels, rakes, sifting pans, etc) are items of the trade for illegal artifact collectors, who often keep these tools in close proximity to themselves, and their product and proceeds.

l.  Illegal artifact collectors often conceal evidence of illegal artifact collecting in vehicles outside of their residences for ready access and to prevent detection and

seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes evidence tending to show the illegal collecting and trafficking of artifacts (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

m.  Illegal artifact collectors often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that illegal artifact collectors and traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's artifacts or artifact proceeds. Illegal artifact collectors also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' illegal

artifact trafficking activities and conversations related to illegal artifact collecting and trafficking.

n.  Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

## COMPUTERS, ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9.  As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the Subject Premises, in whatever form they are found.  Much of the evidence and records described in the paragraphs above, and in Attachment B, can also be produced and/or stored on computers, digital media and other storage media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all

10

under Rule 41(e)(2)(B).

10.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

11.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing

11

evidence of how a computer has been used, what it has been used for, and who

has used it requires considerable time, and taking that much time on premises

could be unreasonable. Storage media can store a large volume of information.

Reviewing that information for things described in the warrant can take weeks or

months, depending on the volume of data stored, and would be impractical and

invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and

configurations.  Therefore, searching them sometimes requires tools or knowledge

that might not be present on the search site.  The vast array of computer hardware

and software available makes it difficult to know before a search what tools or

knowledge will be required to analyze the system and its data on the Premises.

However, taking the storage media off-site and reviewing it in a controlled

environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be

stored in a variety of storage media formats that may require off-site reviewing

with specialized forensic tools.

12.   *Nature of examination.*  Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

computers and/or storage media that reasonably appear that they may contain some or all of the

12

evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## PROBABLE CAUSE

13.    The following information is based upon my personal knowledge as well as information provided by other federal, state or local officers and is presented as probable cause to search the Subject Premises. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every known fact regarding the instant investigation.  More specifically, I have set forth only pertinent facts that I believe are necessary to establish probable cause to search the Subject Premises for evidence of violations of 25 U.S.C. § 3001 – Native American Graves Protection and Repatriation Act, and 16 U.S.C. § 470aa – Archaeological Resource Protection Act ("ARPA").

14.    On Tuesday, February 21, 2023, I received a report of possible ARPA violation in the area located at Lat 32.7589 Long -106.78333. This location, known as Burton Beads, is a Classic Mimbres Pueblo with a sizeable number of artifacts, is within Dona Anna County New Mexico and on BLM administered lands.

15.    The initial complaint was received from Garrett Leitermann who is an Archeologist with the BLM. Leitermann stated he has been tracking online activity (Facebook

Profile) of Christopher WOOD. WOOD posted on Facebook, Sunday February 5, 2023. The post contained photos and a video clip of WOOD at the Burton Beads site collecting artifacts, primarily an arrowhead he digs out of the ground. After finding the online activity, Leitermann made SA Wilson and Field Staff Ranger (FSR) Aaron Millhench aware of the situation.

16.     On Thursday, February 23, 2023, I checked WOOD's Facebook profile which revealed the post from Sunday, February 5, 2023, of WOOD digging up the arrowhead and other photos of artifacts. The video of WOOD digging up the arrowhead provided a view of the surrounding area and a distinguishing feature of a pot drop next to the location.

17.     On Tuesday, February 23, 2023, FSR Millhench, Leitermann, and I drove to the Burton Beads site. Once at the site, Leitermann was able to find the location of the pot drop, which provided a known location for where the Arrowhead was dug up by WOOD. The dig site is located at Lat 32.79543725, Long -106.78169611. This location is within the Burton Beads site, in Dona Anna County, New Mexico, and on BLM administered lands.

18.     On Wednesday, March 29, 2023; FSR Millhench and I drove to WOOD's home, located at 1050 S Triviz Drive in Las Cruces, New Mexico, in an attempt to interview him regarding the social media posts. WOOD was not home at the time. I then called WOOD on a phone number provided by FSR Millhench, 575-405-7700. A male answered and I asked to speak with Christopher WOOD. The caller on the other end stated that he was Christopher WOOD. I then asked WOOD if we could sit down and talk. WOOD stated that he would talk with me and asked if they could meet the following day.

14

19.     On Thursday, March 30, 2023, WOOD called me at approximately 7:30 a.m. and asked if we could meet that morning. I asked WOOD if 8:30 a.m. would work for him to which WOOD said it would.

20.     On Thursday, March 30, 2023, at approximately 8:30 a.m., I and FSR Millhench arrived at WOOD's residence and knocked on his front door. WOOD answered the door and advised me and FSR Millhench to enter the residence. Upon entering the residence, WOOD stated he knew why we were there. I then asked WOOD where in the home he would like to talk. WOOD stated the living room.

21.     FRS Millhench and I talked with WOOD for approximately one hour. During the interview, WOOD admitted to taking multiple artifacts he found in the desert. WOOD stated he knew the location most of the items had taken from and explained the locations to me and FSR Millhench. Most of the locations WOOD took artifacts from were on federal land administer by the BLM. WOOD stated he was unsure who owned the land most of the items were taken from. WOOD also admitted to having been contacted by FSR Millhench previously and knew the taking of artifacts from BLM land was illegal.

22.     I showed WOOD a printout of a Facebook post WOOD had posted on Sunday, February 5, 2023, which was the posting was of an arrowhead WOOD had dug out of the ground on federal land. WOOD admitted to taking the arrowhead. I asked WOOD where the arrowhead was currently located. WOOD pointed to a display case in the corner of his living room. The display case contained the arrowhead in question and 43 other artifacts WOOD admitted to

taking and purchasing. WOOD then advised me that I could take the display case and any other items I believed WOOD was not authorized to have in his possession.

23.     I asked wood if he had any pottery in his possession, WOOD stated he does not collect pottery. I then advised WOOD I have social media posts of pottery in his home. WOOD then stated he put it back in the desert and does not have any in his home.

24.     During the time we were in the Subject Premises, we did not do a full search of the residence but only looked at the areas WOOD pointed out.  At one point, I was unsure about where we were going next and attempted to walk down a hallway.  WOOD told me that other items were in the kitchen and directed me away from the hallway.  Based on this, I believe there may be other items still in the Subject Premises that WOOD was not willing to show us at that time.

25.     I asked WOOD if he used his cellular telephone to take photos of the items he finds and takes, WOOD stated he did. I asked WOOD if he had any other cameras of computer devices to which WOOD stated he did not. I asked WOOD if I could see the photos on his phone from February 5, 2023, to which WOOD replied he had recently deleted everything off his phone.  WOOD then showed me and FSR Millhench the phone gallery with nothing visible.

26.     During the course of the interview WOOD admitted to taking several items out of his home that morning and hiding them at a separate location so FSR Millhench and I would not find them. After the interview WOOD voluntarily took me and FSR Millhench to 1716 N. Mesquite Street in Las Cruces, New Mexico, and recovered the previously hidden items. The

16

items included approximately 28 artifacts ranging from military buttons, arrowheads, rock drills and grinding stones. WOOD willingly handed all 28 items over to me and described where he had found each item. Most of the 28 items recovered were taken from federal land.

27.     Based upon the information contained in this Affidavit, The presence of illegally obtained artifacts recovered in his residence, WOOD making statements to having other pieces that he "put back" and WOOD's admitting to his removing and hiding of items from law enforcement I believe there is probable cause to believe the Subject Premises contains evidence of violations of 25 U.S.C. § 3001 – Native American Graves Protection and Repatriation Act, and 16 U.S.C. § 470aa -- Archaeological Resource Protection Act.

## CONCLUSION

28.     I submit that this affidavit supports probable cause for a warrant to search the Subject Premises described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Nicholas Wilson
Special Agent/ Criminal Investigator
Department of Interior, Bureau of Land
Management

Electronically signed and telephonically sworn
on March 31, 2023:

KEVIN R. SWEAZEA,
UNITED STATES MAGISTRATE JUDGE

17